UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VICTOR MICHEL, ET AL.                                    CIVIL ACTION

VERSUS                                                          NO. 18-4738

FORD MOTOR COMPANY, ET AL.                      SECTION "R" (4)

## ORDER AND REASONS

Before the Court are defendants Cummins's and Ford's motions to exclude or limit the expert testimony of Dr. Brent Staggs,[1] Dr. Murray Finkelstein,[2] and Christopher Depasquale.[3] Because the experts' methodologies are reliable and their opinions are relevant, the Court denies the motions.

## I.    BACKGROUND

This case arises out of Victor Michel's alleged asbestos exposure as a result of his work as a mechanic and generator service technician.[4] Michel worked as a parts delivery driver, truck mechanic, generator service

---

[1]    R. Doc. 67.
[2]    R. Doc. 68.
[3]    R. Doc. 69.
[4]    R. Doc. 1 at 2.  A more in-depth discussion of the facts underlying this dispute can be found in the Court's August 28, 2018 order.  *See* R. Doc. 34.

technician, and "owner operator" from 1965 to 2005.[5]  He filed this action in state court on July 28, 2017, after being diagnosed with mesothelioma.[6]  Defendants removed the case to federal court on May 8, 2018.[7]  On June 12, 2018, Michel died.[8]  The Court substituted his survivors as plaintiffs on July 10, 2018.[9]  Defendants have now filed motions to exclude or limit the expert testimony of plaintiffs' experts, Dr. Brent Staggs, Dr. Murray Finkelstein, and Christopher Depasquale.[10]  Plaintiffs oppose the motions.[11]

## II.   LEGAL STANDARD

This is a toxic torts case in which plaintiffs allege that brakes and gaskets containing asbestos caused Michel's mesothelioma.  Accordingly, plaintiffs must show general causation—that asbestos can cause mesothelioma—and specific causation—that defendants' products caused Michel's mesothelioma.  *See Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir. 2007) ("General causation is whether a substance is capable of causing a particular injury or condition in the general population,

---

[5]      R. Doc. 1-2 at ¶ 6.
[6]      *Id.*
[7]      R. Doc. 1.
[8]      R. Doc. 21.
[9]      *Id.*
[10]      R. Doc 67; R. Doc. 68; R. Doc. 69.
[11]      R. Doc. 72; R. Doc. 73; R. Doc. 74.

while specific causation is whether a substance caused a particular individual's injury."). A court may admit specific-causation evidence only after the plaintiff has produced admissible evidence on general causation. *See id.* ("[I]f it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible specific-causation evidence.").

A district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702, which governs the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may provide opinion testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To be admissible, Rule 702 requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. *Id.*

In *Daubert v. Merrell Dow Pharmaceuticals, Incorporated*, the Supreme Court held that Rule 702 requires the district court to act as a

gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (clarifying that the *Daubert* gatekeeping obligation applies to all forms of expert testimony). The Court's gatekeeping function involves a two-part inquiry. First, the Court must determine whether the expert testimony is reliable. The party offering the testimony has the burden to establish reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The Court must assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 590. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* The Court's inquiry into the reliability of expert testimony is flexible and necessarily fact-specific. *See Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir. 2000).

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. This is primarily an inquiry into the relevance of the expert testimony. *See id.*; *see also Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). Expert testimony is unnecessary if the court finds that "the jury could adeptly

assess [the] situation using only their common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990).

But a court's role as a gatekeeper does not replace the adversary system. *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## III. DISCUSSION

### A. Motion to Exclude or Limit Dr. Brent Staggs's Testimony

Defendants argue that Dr. Brent Staggs's testimony should be excluded because his opinions are the product of an unsound methodology.[12] Dr. Staggs is a pathologist who seeks to give both general and specific causation

---

[12] R. Doc. 67-1 at 1.

opinions at trial.[13]  His general causation opinion is that even brief or low-dose asbestos exposure can cause peritoneal mesothelioma.[14] *See Knight,* 482 F.3d at 351 ("General causation is whether a substance is capable of causing a particular injury or condition in the general population . . . ."); *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 726 (5th Cir. 2009) (a general causation opinion must incorporate the level of exposure and the type of cancer at issue).  His specific opinion is, first, that Michel's mesothelioma was caused by his cumulative asbestos exposure, and second, that the products of each defendant substantially contributed to Michel's illness.[15]  *Knight*, 482 F.3d at 351 ("[S]pecific causation is whether a substance caused a particular individual's injury.").  Staggs's opinions—as expressed in his initial report, supplemental reports, and his timely disclosed affidavit[16]—are based on his review of the medical records, exposure history,

---

[13]     R. Doc. 67-6 at 8.
[14]     R. Doc. 73-1 at 3-8.
[15]     R. Doc. 67-6 at 8.
[16]     Defendants argue that at the time Dr. Staggs issued his original report, on August 2, 2017, he did not have sufficient facts or data to render his opinion.  *See* R. Doc. 93 at 2-3.  But Dr. Staggs properly supplemented his report as more factual materials became available, so the Court looks to his opinion as expressed in the original and supplemented reports together.  *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (holding that expert testimony was reliable and properly disclosed when his "supplemental expert report, combined with his original expert report, gave [the opposing party] sufficient information . . . .").  Defendants argue that because the supplemental materials did not change Dr. Staggs' conclusion,

and deposition of Michel, on the expert reports of industrial hygienist Christopher DePalquale and epidemiologist Dr. Murray Finkelstein, and on peer-reviewed, published studies.[17] Dr. Staggs' also employs two accepted methodologies for determining causation: the Bradford-Hill Criteria, and the criteria of the Helsinki Consensus Report.

Defendants do not seriously contest that Staggs' underlying methodologies are reliable;[18] experts have relied on these techniques in many asbestos cases to determine causation. *See, e.g.*, *Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1301 (11th Cir. 2017); *Gannon v. United States*, 292 F. App'x 170, 173 n.1 (3d Cir. 2008) ("The Bradford Hill criteria are broadly accepted criteria for evaluating causation that have been developed by scientists such as Sir Bradford Hill." (internal quotation omitted)); *Vedros v. Northrop Grumman Shipbuilding, Inc.*, No. 11-1198, 2015 WL 4602973, at *5 (E.D. La. July 29, 2015). Defendants focus instead on the relevancy

---

they cannot contribute to the reliability of his method. R. Doc. 67-1 at 6. This conclusion does not follow in logic or in fact. Indeed, a supplemental report that *changes* an expert's conclusion calls into question his reliability, whereas a consistent opinion does the opposite. *See Brennan's Inc. v. Dickie Brennan & Co., Inc.*, 376 F.3d 356, 374-75 (5th Cir. 2004) (holding that a changed conclusion is "a cause for pause" when evaluating reliability).

[17]  *Id.*

[18]  *Id.* at 6.

requirement of *Daubert*, namely whether Dr. Staggs reliably applied the principles to the facts of the case.

Specifically, defendants attack Staggs's general causation opinion because the Helsinki Consensus discusses amphibole asbestos and pleural mesothelioma, but Michel was exposed to chrysotile asbestos and diagnosed with peritoneal mesothelioma.[19]  First, the Helsinki Consensus specifically states that "all types of malignant mesothelioma can be induced by asbestos, with the amphiboles showing greater carcinogenic potency than chrysotile."[20] This conclusion is not limited to pleural mesothelioma or amphibole asbestos.  Further, the Report lists criteria to be considered in the assessment of occupational etiology, which are also not so limited.  These include conclusions that:

- The great majority of mesotheliomas are due to asbestos exposure.
- Mesothelioma can occur in cases with low asbestos exposure . . . .
- About 80% of mesothelioma patients have had some occupational exposure to asbestos, and therefore a careful occupational and environmental history should be taken.
- An occupational history of brief or low-level exposure should be considered sufficient for mesothelioma to be designated as occupationally related.[21]

---

[19]     R. Doc. 67-1 at 12-15.
[20]     R. Doc. 67-9 at 3.
[21]     *Id.*

8

Michel's occupational history—which arguably includes exposure to asbestos in automotive brakes for two to three years at Gulf Bottlers and approximately a year at Crescent Ford, and then exposure to asbestos in generator gaskets for twenty-one years[22] at Menge Pump—are substantially above the "brief" occupational exposure the Report concludes "should be considered sufficient for mesothelioma to be designated as occupationally related."[23] Defendants' contention the Helsinki Consensus Report criteria are not relevant to this case is thus incorrect.

In any event, Dr. Staggs's general causation testimony clearly considers both types of asbestos and the possible differences between them. He acknowledges that, "some scientist[s] believe there's a big potency difference and that chrysotile is not nearly as potent as the amphiboles," but explains, "that's a highly debated topic."[24] He then goes on to cite studies showing that individuals exposed to chrysotile asbestos showed a "linear dose response" of increased risk of mesothelioma,[25] and that the relative potencies of different types of asbestos is unclear.[26] Similarly, Dr. Staggs's affidavit states, "[i]t has been demonstrated for decades through scientific study that

---

[22]    R. Doc. 93-1 at 28.
[23]    R. Doc. 77-4 at 3-5.
[24]    R. Doc. 67-4 at 26.
[25]    *Id.* at 26-27.
[26]    *Id.*

the inhalation of asbestos fibers *of all fiber types* causes mesothelioma" and cites twenty-four sources that support this opinion.[27]  Dr. Staggs also cites multiple studies relating to auto-mechanics and asbestos exposure from brakes specifically.[28]  Defendants' allegation that Staggs failed to consider the types of asbestos and mesothelioma at issue misrepresents the conclusions of the Helsinki Consensus Report and Dr. Staggs's testimony.

Defendants argue that Dr. Staggs's conclusions are unreliable because he ignores studies that show no increased risk of mesothelioma among vehicle and engine mechanics.[29]  But Dr. Staggs explicitly states that he did consider these studies in forming his opinion.[30]  He then goes on to say that he does not find those studies credible in light of the larger numbers of studies finding a connection between brake work and engine work and increased risk of mesothelioma.[31]  Dr. Staggs also discounted these studies because they are either biased, industry sponsored, used bad data, or came

---

[27]    R. Doc. 73-1 at 3 (emphasis added).
[28]    R. Doc. 67-4 at 28-29.
[29]    R. Doc. 67-1 at 14.
[30]    R. Doc. 67-4 at 29 ("I'll consider [these studies].  Certainly, I'll try to read all the pros and cons of available information . . . .").
[31]    *Id.* ("[I]t's been shown over and over again that doing that work . . . creates airborne asbestos at significant concentrations.  And so to say somehow because we've taken a few large cohorts that are mixed with people that don't always do that same kind of work . . . I just don't really buy that all the time.").

to an untenable conclusion.[32]  Given that studies on this topic have produced varied results, and that Dr. Staggs has cited ample support for his conclusions, the conflicting studies are best addressed during cross-examination.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants also argue that Dr. Staggs did not consider the dose of asbestos exposure in forming his general causation opinion.[33]  But Dr. Staggs incorporates exposure dosages into his general causation opinion multiple times in his testimony, as well as in his affidavit.  His affidavit states that "lower range and short term exposures (often characterized as 'low dose') cause mesothelioma," according to nine cited sources.[34]  Dr. Staggs also testified that "even brief or low dose exposures are known to cause mesothelioma . . . we've established that over and over again, over decades . . . ."[35]  Defendants' contention that his general causation opinion does not consider dose is incorrect.

---

[32]    *Id.* at 37.
[33]    R. Doc. 67-1 at 12.
[34]    R. Doc. 73-1 at 7.
[35]    R. Doc. 67-4 at 25.

With regard to Dr. Staggs's specific causation opinion, defendants argue that he did not use objective criteria or a coherent methodology to arrive at his opinion.[36]   They argue that because of his lack of coherent methodology, Dr. Staggs effectively opines that any asbestos exposure increases the risk of mesothelioma, and therefore exposure to defendants' products necessarily caused Michel's mesothelioma.  Defendants point out that other courts in the Eastern District have rejected this logical leap.[37]  *See Comardelle v. Pa. Gen. Ins. Co.*, 76 F. Supp. 3d 628, 634 (E.D. La. 2015); *Vedros v. Northrop Grumman Shipbuilding, Inc.*, 119 F. Supp. 3d 556, 563 (E.D. La. 2015); *Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2016 WL 5847124, at *3 (E.D. La. Oct. 6, 2016).

Defendants mischaracterize Dr. Staggs' opinion.  Dr. Staggs' specific causation opinion has two components.  He first opines that, "Michel's cumulative exposure to asbestos of all fiber types was the cause of his malignant mesothelioma."[38]   He further concludes that, "the cumulative exposures to asbestos from each of the products identified in the testimony was a substantial contributing factor to the overall cumulative dose of

---

[36]   R. Doc. 67-1 at 15-19.
[37]   *Id.* at 21-24.
[38]   R. Doc. 67-6 at 8.

asbestos," and to Michel's mesothelioma."[39]  Dr. Staggs's methodology on cumulative exposure is based on differential etiology.[40]  Differential etiology, sometimes referred to as differential diagnosis, is a set of objective criteria that has been used in many other cases for specific causation opinions. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012) (holding that properly performed differential etiology is a reliable method for determining specific causation); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999) ("[T]he overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry.").

Under this methodology, Dr. Staggs (1) identifies potential causes; (2) determines whether the individual had exposure in a dose similar to one that caused the disease in other cases; and (3) rules out other potential causes.[41] Dr. Staggs testified that there are "almost no other established causes of mesothelioma, especially in the United States."  He also testified that Michel's level of exposure is equal to the exposure of many others who have

---

[39]  *Id.*
[40]  R. Doc. 67-4 at 20.
[41]  *Id.*

developed mesothelioma.[42]  Then, to arrive at his opinion that exposure to each of the defendants' products significantly contributed to his disease, Dr. Staggs uses a "semiquantitative" analysis to make a "relative comparison" of exposure levels.[43]  He testified that he formed his opinion on whether the exposures from the individual defendants was a substantial contributing factor to the overall exposure level based on his personal knowledge and experience, as well as published literature on the topic:

> [W]hen I look at exposures for a given individual for a specific question, specific causation, I correlate those to that individual's overall exposures, not as an absolute number because . . . exposure is different in a different context.  If someone only has a few small exposures, then suddenly that small exposure is a big percentage of their exposures.  But if someone has a very small exposure, and they have a, you know, some other huge exposure, then it dwarfs it.  In that context, I might consider that trivial to that person.[44]

Staggs' methodology is not equivalent to the "anything higher than background" opinions that other Eastern District courts have excluded.  The specific causation opinions in those cases were inadmissible because the experts automatically classified any exposure above a baseline level as significant.  *See Comardelle*, 76 F. Supp. 3d at 634 (expert opined that any exposure is significant); *Vedros*, 119 F. Supp. 3d at 563 (expert opined that

---

[42]   *Id.*
[43]   *Id.* at 19-20.
[44]   *Id.*

any exposure above background levels is significant); *Bell*, 2016 WL 5847124, at *3 (every exposure equivalent to those recognized in the academic literature as having the potential to increase the statistical risk of mesothelioma is significant). Here, Dr. Staggs compiled a detailed work history for Michel, and his opinion is based on a relative comparison of the exposures based on this history.[45] This methodology is not, as defendants contend, based on what a jury would believe,[46] nor is it impermissible because it defines the level at which an exposure becomes significant on a case by case basis. Dr. Staggs is not required to announce a minimum level at which an exposure becomes significant in order to form an admissible specific causation opinion. Because Dr. Staggs's expert opinion is both reliable and relevant, the Court denies defendants' motion to exclude or limit his testimony.

---

[45] R. Doc. 67-6 at 3-7, 8.

[46] *See* R. Doc. 67-1 at 18; R. Doc. 93 at 1. The discussion of what a jury would believe arose only after defendants introduced this line of questioning during Dr. Staggs's deposition. Dr. Staggs's methodology, as he testified, is to make a relative comparison of exposures, not to merely guess at what a jury would believe. Defendants distort Staggs' specific causation testimony by taking these statements out of the context of his testimony as a whole.

## B. Motion to Exclude or Limit Dr. Murray Finkelstein's Testimony

Defendants argue that the Court should exclude Dr. Murray Finkelstein's testimony because his opinions are the product of unsound methodology.[47] Dr. Finkelstein is an epidemiologist who proposes to testify that Michel developed mesothelioma as a result of his exposure to asbestos contained in friction products and gaskets.[48] His opinions rely on numerous published studies demonstrating the connection between asbestos and mesothelioma,[49] which can be a reliable methodology under *Daubert*. *See Daubert*, 509 U.S. at 593-94.

Defendants first attack Dr. Finkelstein's calculations of the levels of asbestos to which Michel was exposed during his work with defendants' products. They argue that his methodology for calculating exposure, in which he multiplied the estimated amount of exposure per task by the amount of time that Michel estimated that he spent doing that task, is unreliable because minor changes to the inputs have a major change on the overall level of asbestos exposure, and because they allege that his

---

[47] R. Doc. 68-1 at 1.
[48] R. Doc. 72 at 3-4.
[49] *See* R. Doc. 68-2 at 17-19.

calculations contain mathematical errors.[50]  They also challenge the whole methodology as untested and unsubstantiated.[51]

Defendants' assertion that Finkelstein's methodology is untested and unsubstantiated is incorrect—plaintiffs have pointed to at least one published, peer-reviewed article that used the same methodology to evaluate exposure, which refers to this method as a way that lifetime exposure to asbestos is "often expressed."[52]  Although this study did not calculate risk percentages for the exposure rates it measured, it measured exposures the same way, and it states that "[c]umulative occupational exposures are often used when attempting to characterize the plausible lifetime cancer risk for asbestos," indicating that Dr. Finkelstein's calculation of risk is a commonly accepted way to connect exposure levels to incidences of cancer.[53]  Potential mistakes in Dr. Finkelstein's application of an accepted methodology do not warrant the exclusion of his testimony, although they can be a fertile ground for cross-examination.  *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("The proponent of an expert's testimony need not prove the testimony is factually correct, but rather need only prove by a

---

[50]     R. Doc. 68-1 at 6-8.
[51]     *Id.* at 9.
[52]     *See* R. Doc. 72-3 at 4.
[53]     *Id.*

preponderance of the evidence the testimony is reliable."). In addition, he need not calculate an exact concentration of asbestos to which the plaintiff was exposed, because the law does not require plaintiffs to supply an exact exposure level to prevail. *Vedros v. Northrop Grumman Shipbuilding, Inc.*, No. 11-1198, 2015 WL 3916248, at *4-*5 (E.D. La. June 25, 2015) (holding that expert testimony was reliable even though he did not calculate the concentration of asbestos to which plaintiff was exposed because "the Court must consider the difficulty involved in conducting such calculations, due to the substantial amount of time that has passed," and because such calculations are not required as long as "a plaintiff has . . . sufficient evidence to raise a genuine issue of material fact regarding his exposure to asbestos").

Defendants next argue that Dr. Finkelstein's conclusion that chrysotile brake and gasket dust translate to the peritoneum is not supported by the studies that Dr. Finkelstein cites.[54] Dr. Finkelstein cites two studies in support of his conclusion that asbestos fibers translocated to Michel's peritoneum and thereby caused his peritoneal mesothelioma: a study that measured the translocation of asbestos from brake pads manufactured with chrysotile asbestos into the lung and pleura of rats (the Bernstein study), and a study that tested for asbestos in tissue from various parts of the body in

_____

[54]    R. Doc. 68-1 at 9-12.

individuals diagnosed with mesothelioma (the Dodson study).[55]  Defendants contend that the Bernstein study is insufficient support for Dr. Finkelstein's conclusion because the fibers in that study translocated only to the pleura, not to the peritoneum.[56]  But Dr. Finkelstein need not rely on the Bernstein study to support his opinion that the asbestos fibers translocated to the peritoneum specifically, because he relies on the Dodson study for this principle.  The Bernstein study merely shows that chrysotile asbestos, the type of asbestos to which Michel was allegedly exposed, can translocate.  It is a relevant source for that purpose.

Defendants also argue that the Dodson study is inapplicable because there was no evidence of asbestos in the peritoneum of the only mechanic studied.[57]  This is irrelevant because a sample size of one is too small to provide convincing evidence in either direction.  Rather than focusing on mechanics specifically, Dr. Finkelstein relies on the Dodson study for the general principle that asbestos fibers translocate to the peritoneum when inhaled, which is indeed the conclusion of that study.[58]  The studies on which Dr. Finkelstein relies are therefore relevant support for his opinion that

---

[55]     *See* R. Doc. 72-4; R. Doc. 72-6.
[56]     R. Doc. 91 at 6.
[57]     R. Doc. 68-1 at 11-12.
[58]     *See* R. Doc. 72-6.

asbestos translocated to Michel's peritoneum and thereby caused his peritoneal mesothelioma.

Defendants argue that Dr. Finkelstein's specific causation testimony, like Dr. Staggs's testimony, should be excluded because it is indistinguishable from the "any exposure above background" theory that other Eastern District courts have rejected.[59] As already explained, these cases disallowed theories of specific causation that took any exposure above background levels or at any level that could increase risk of disease as substantially contributing to a plaintiff's illness. Dr. Finkelstein explicitly testified that he does not believe that any exposure above background levels or that any exposure that causes risk was therefore a substantial factor in causing Michel's disease.[60] When asked whether he believes that every asbestos exposure contributes to a person's contraction of mesothelioma, he answered, "No, I believe that all exposures contribute to the risk of developing mesothelioma."[61] He then distinguished increased risk from causation.[62] Dr. Finkelstein's answer explicitly addresses the concern in *Comardelle* and similar cases. He instead bases his specific causation

---

[59] R. Doc. 68-1 at 17-23.
[60] *See* R. Doc. 68-3 at 47-48.
[61] *Id.* at 47.
[62] *Id.* at 48.

opinion on changes in risk that cancer control agencies such as the Cancer Control Agency of Ontario and the National Cancer Institute of the United States consider significant.[63]  His causation opinion is different than the previously excluded theories, and it is sufficiently reliable under *Daubert*.

Finally, Defendants argue that Dr. Finkelstein lacks support for his contention that the chrysotile asbestos in defendants' products was contaminated with tremolite.[64]  They further argue that, even if it were contaminated, the literature that Dr. Finkelstein relies on to establish the link between tremolite asbestos and peritoneal mesothelioma is flawed.[65] Michel testified to working with Bendix brake products while he was a mechanic at Gulf Bottlers, where he serviced mostly Ford trucks.[66]  Dr. Finkelstein asserts that Michel was exposed to tremolite asbestos during his work with Bendix brakes because he "ha[s] seen purchase orders confirming that Canadian asbestos was used in the manufacture of friction products" at certain plants producing Bendix brake products.[67]  In addition to his

---

[63]     R. Doc. 68-3 at 27-28.
[64]     R. Doc. 68-1 at 12-13.
[65]     *Id.* at 13-14.
[66]     R. Doc. 91-1 at
[67]     R. Doc. 68-2 at 7.  Plaintiffs have also attached an affidavit from Dr. Finkelstein, stating that Bendix brakes contained tremolite asbestos, to their response in opposition to defendants' motion.  *See* R. Doc. 72-2.  Dr. Finkelstein's conclusions in his affidavit essentially duplicate the

firsthand knowledge, Dr. Finkelstein relies on a published study by Compton and Millette that measured tremolite asbestos in a Bendix brake shoe.[68] Michel's deposition testimony, Dr. Finkelstein's knowledge of Bendix asbestos suppliers, and the Compton and Millette study constitute a reliable basis for Dr. Finkelstein's opinion that Michel was exposed to tremolite asbestos.

Defendants' argument that no established link exists between tremolite asbestos and peritoneal mesothelioma is directly contrary to their core defense that chrysotile asbestos is less harmful and less likely to translocate than amphibole asbestos.   Tremolite asbestos is a type of amphibole,[69] which defendants themselves describe as, "more likely to translocate to the peritoneal space than . . . chrysotile's fibers."[70] Defendants have also asserted that, "published literature shows that fiber counts of amphiboles are higher than fiber counts of chrysotiles found in the mesentery omentum of asbestos exposed individuals" citing the Dodson

---

information contained in Dr. Finkelstein's initial report, so the Court need rely only on the initial report.
[68]     *Id.*
[69]     *See    Tremolite*,    Merriam-Webster,    https://www.merriam-webster.com/dictionary/tremolite (last visited Jan. 7, 2019) (defining tremolite as "a white or gray mineral of the amphibole group that is a silicate of calcium and magnesium").
[70]     R. Doc. 67-4 at 36.

study in particular as support for this premise.[71]   In other words, by defendants' own account, tremolite, as an amphibole, is more biopersistent and thus more likely than chrysotile to translocate from the lungs to the stomach, thereby causing peritoneal mesothelioma.  Accordingly, the Court does not find merit in defendants' argument that the link between tremolite and peritoneal mesothelioma has not been sufficiently established.  To the extent that defendants take issue with the particular studies that Dr. Finkelstein cites to establish this connection, they can make their points through cross-examination.

### C.    Motion to Exclude Christopher Depasquale's Expert Testimony

Defendants argue that the Court should exclude the opinions of plaintiffs' industrial hygienist, Christopher Depasquale, because his methodology is unreliable, and because his testimony will not assist the jury.[72] Depasquale seeks to testify to Michel's asbestos exposure levels, using comparisons to the levels given in published studies for mechanical work similar to Michel's.[73]  Depasquale quantifies exposure levels and assesses

---

[71]    *Id.*
[72]    R. Doc. 69-1 at 5.
[73]    R. Doc. 69-2 at 8.

risk, which provides a foundation for other expert testimony and for the jury, rather than offering a causation opinion himself.[74]

Defendants argue that Depasquale's testimony will not be helpful to the jury because plaintiffs' other experts do not rely on his opinion in forming their own causation opinions, and because he does not opine on Michel's cumulative asbestos exposure, which is the figure upon which the other experts base their causation opinions.[75] First, Dr. Staggs's supplemental expert report states that he relied on Depasquale's report in forming his opinions.[76] Second, Depasquale's testimony is helpful to a jury even if other experts do not rely on it, because Depasqule quantifies asbestos exposure levels from each defendant. These exposure levels speak to whether exposure from a particular defendant's products substantially contributed to Michel's injury. *See Hennegan*, 837 So. 2d at 102-03. Defendants' claim that Depasquale's testimony is not useful because he does not calculate a cumulative exposure level is refuted by the fact that most published studies and OSHA similarly calculate risk based on air concentration metrics rather

---

[74] R. Doc. 69-3 at 35.
[75] R. Doc. 69-1 at 8-10.
[76] R. Doc. 67-6 at 7.

than a cumulative exposure level.[77]  Depasquale can more effectively opine on risk if his calculations match the metrics that OSHA uses to give guidelines for workplace safety, which he uses as a comparator.  Defendants' argument that Depasquale's testimony is unhelpful to the jury is therefore meritless.

Defendants argue that Depasqule's lack of brand-specific information in forming his opinion on the level of asbestos Michel was exposed to in his work on gaskets renders it irrelevant.[78]  In forming his opinion on Michel's exposure through gasket work, Depasquale relies on studies of asbestos in the removal of gaskets from industrial flanges rather than automotive engines.[79]  But Depasquale testified that his reason for relying on these studies is that they involved work and techniques that were most similar to the work that Michel did on gaskets.[80]  In addition, Depasquale testified that some of the gaskets studied are likely smaller than those with which Michel worked, so the asbestos exposure would have been smaller than Michel's actual exposure.[81]  The exact specifications of defendants' particular gaskets

---

[77]     R. Doc. 69-3 at 50, 53; Occupational Safety and Health Administration (OSHA), *Asbestos-Automotive Brake and Clutch Repair Work*, (July 26, 2006), https://www.osha.gov/dts/shib/shib072606.html.
[78]     R. Doc. 69-1 at 11.
[79]     *Id.* at 12.
[80]     R. Doc. 69-3 at 72-73.
[81]     *Id.* at 74.

that Michel worked on are unknown.  Depasquale has used data as close as possible based on the information available, a technique that other courts on the Eastern District have endorsed for exposure reconstruction assessments. *See Smith v. Union Carbide Corp.*, No. 13-6323, 2015 WL 575315, at *3 (E.D. La. Feb. 11, 2015); *see also Verdos*, 2015 WL 3916248, at *4 (holding that motions *in limine* seeking to exclude testimony because it does not establish that a plaintiff was exposed to significant asbestos from a particular defendant's products is inappropriate and should instead be addressed in a motion for summary judgment).  The gasket studies are relevant and reliable data for Depasquale's gasket opinion.

Defendants make a similar argument with regard to Depasquale's friction product opinions.[82]  But defendants point to no jurisprudence requiring an expert opinion to be based on studies about their exact products.  Relying on data from published studies of similar products being used in similar ways, especially when defendants cannot point to significant inaccuracies in these comparisons, is sufficient for reliability purposes.  *See id.*

Defendants also argue that Depasquale's testimony is cumulative, prejudicial, and lacks probative value under Federal Rule of Evidence 403,

---

[82]    R. Doc. 69-1 at 13.

for the same reasons it argued that his methodology was unreliable.[83]  But Depasquale's testimony is not cumulative of Dr. Finkelstein because he is an industrial hygienist with experience testing asbestos emissions, not an epidemiologist.  Having established that his methods are reliable, the Court finds that Depasquale's testimony is more probative than prejudicial under Federal Rule of Evidence 403.  Accordingly, the Court denies defendants' motion to exclude or limit his testimony.

## IV.   CONCLUSION

For the foregoing reasons, defendants' motions to exclude or limit Dr. Brent Staggs' testimony, Dr. Murray Finkelstein's testimony, and Christopher Depasquale's testimony are DENIED.

New Orleans, Louisiana, this __7th__ day of January, 2019.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[83]    *Id.* at 17-18